UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| MELISSA STORY BATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:13 CV 99 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Melissa Anne Story Bates for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff was born on August 28, 1976. (Tr. 127.) She filed her applications on October 21, 2009, alleging an onset date of June 1, 2007 and alleging disability due to bipolar disorder and acid reflux. (Tr. 127, 134, 171-72.) Her applications were denied initially, and she requested a hearing before an ALJ. (Tr. 11, 68-77.)

On August 14, 2012, following a hearing, the ALJ issued an unfavorable decision. (Tr. 11-22.) The Appeals Council denied her request for review. (Tr. 1.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL AND OTHER HISTORY

On July 19, 2007, plaintiff was admitted to Hannibal Regional Hospital for a psychotic episode at which time she had been hallucinating about her deceased grandparents.  She had also recently attempted to run in front of a car and was stopped by family members.  She had recently experienced the deaths of two family members and had a controlling husband.  She was taking Zoloft, an antidepressant, and it was discontinued.  She was started on Carbatrol, used to treat bipolar disorder.  She was diagnosed with bipolar disorder, depressed, with psychotic features.  She was significantly improved upon discharge on July 24, 2007.  (Tr. 223-34.)

Plaintiff was seen at the Arthur Center in Mexico, Missouri, from December 2007 to February 19, 2010 for outpatient treatment for her bipolar disorder.  During that period she had many situational stressors and was frequently depressed.  She was treated with Depakote, for bipolar disorder, and Lexapro, an antidepressant.   (Tr. 243-61.)

On March 18, 2010, plaintiff began treatment with Robert A. Parsonson, D.O., a family practitioner, at Preferred Family Healthcare (Preferred Family) in Hannibal, Missouri.  A Psychosocial History/Diagnostic Assessment reported that she wanted her medication adjusted because she could not be around her family or go out and do things.  She reported being on edge a lot, wanting to "blow up," and being very angry.  She sometimes had hallucinations of her grandparents' voices.  She was diagnosed with Schizoaffective, Bipolar Type Disorder.  Dr. Parsonson wanted to rule out Borderline Personality Disorder.  She was having moderate to severe family, relationship, and budgeting problems at the time.  Her GAF score was 50, indicating "serious" symptoms.  (Tr. 333-40.)

Plaintiff saw Dr. Parsonson on March 30, 2010 with complaints of depression, anxiety, irritability, racing thoughts, and hypersomnia.  She reported sleeping sixteen hours per day and smoking a pack of cigarettes per day.  Dr. Parsonson diagnosed schizoaffective disorder, bipolar type, and gastroesophageal reflux disorder (GERD).  He prescribed Lithium, for bipolar disorder, Mellaril, an antipsychotic, and Ranitidine, for

GERD. He opined her prognosis was guarded. He assigned a GAF score of 50, and instructed her to return in in one week. (Tr. 347-48.)

In April 2010, a detailed Individual Treatment and Rehabilitation Plan was prepared for plaintiff at Preferred Family. She was assigned a GAF score of 50. (Tr. 341-45.)

On July 21, 2010, plaintiff saw her primary care physician for abdominal pain at which time her husband reported that she had not been taking her psychiatric medication for several weeks. (Tr. 293.)

On May 17, 2010, state agency medical consultant Mark Altomari, Ph.D., completed a Psychiatric Review Technique form following review of plaintiff's medical records. He found, among other things, that plaintiff had moderate limitations in social functioning. Based on these limitations, plaintiff retained the ability to perform short and simple instructions, relate appropriately to coworkers and supervisors in small numbers and for brief periods, adapt to most usual changes common to competitive work, and make simple work-related decisions. (Tr. 266-79.)

By September 23, 2010, plaintiff was compliant with her Lithium. During that time, she tried other medications for schizophrenia, including Zyprexa, Seroquel, and Invega, as well as Fluoxetine, an antidepressant.

On March 23, 2011, plaintiff underwent an annual evaluation at Preferred Family. She reported taking her medications as prescribed although a report stated she had been noncompliant with caseworker meetings. The evaluation stated she displayed "personality disorder traits, including antisocial, borderline, dependent and histrionic tendencies, but appears more immature than actually personality disordered" and that the "hallucinations she reported years ago were likely related to bereavement." (Tr. 456.) The report stated she "avoids employment although appears capable and has worked within the past year with a boyfriend "junking." (Id.) She was assigned a current GAF score of 58, and 59 for the past year, indicating "moderate" symptoms. The evaluation concluded she remained eligible for services due to anxious and impulsive symptoms and the need for psychiatric

and supportive care. The five professionals who signed the evaluation stated Dr. Parsonson's diagnosis of schizoaffective disorder was an "eligible" diagnosis. (Tr. 453-59.)

On September 14, 2011, Dr. Parsonson wrote on a prescription pad: "[Plaintiff] is in my care for bipolar disorder. Some days she is so depressed she can't get out of bed. Other days she is irritable and should not be around other people." (Tr. 352.) On April 3, 2012, he wrote on a prescription pad: "[Plaintiff] is in my care for bipolar disorder and should be considered permanently disabled." (Tr. 471.)

On April 2, 2012, plaintiff was seen at Preferred Family for her annual evaluation. The Center had been unable to contact her to schedule her evaluation. She was diagnosed with Schizoaffective disorder, bipolar type and borderline personality. Her current GAF score was 52. (Tr. 499-522.)

On April 25, 2012, Dr. Parsonson completed a Mental Medical Source Statement (MSS). He opined that plaintiff had "moderate" limitations in her ability to understand and remember simple instructions; to make judgments on simple work-related decisions; to understand and remember complex instructions, and to carry out simple instructions. She had "marked" limitations in her ability to carry out simple instructions and her ability to make judgments on complex work-related decisions. Dr. Parsonson opined that she had "moderate" limitations in her ability to interact socially with the public, coworkers, and responded appropriately to usual work situations and to changes in routines work settings. She had "moderate" limitation in her ability to interact appropriately with supervisors. He based his statement on plaintiff's subjective report. (Tr. 487-89.)

On May 30, 2012, plaintiff underwent a psychiatric evaluation under Lyle A. Clark, M.D. She reported not doing very well, sleeping a lot, and feeling depressed and agitated. She weighed 264 pounds. She did not think her medications, Zyprexa, Prozac, and Lithium, were working well. She reported having diarrhea from Lithium and feeling sedated since starting Zyprexa. She had psychotic symptoms, including an altered perception of reality with auditory and visual hallucinations. Dr. Clark believed she

- 4 -

described symptoms of Major Depressive Episode. She was assigned a GAF score of 40, indicating major impairment in several areas. Dr. Clark diagnosed severe bipolar I disorder, depressed, with psychotic features; panic disorder with agoraphobia, generalized social phobia, GERD, and IBS. She was to reduce her taking Lithium and Zyprexa, and to start Carbatrol. She was also instructed to return in three weeks. (Tr. 527-30.)

**ALJ Hearing**

On April 23, 2012, plaintiff appeared and testified to the following at a hearing before an ALJ. She is 35 years old. She is 5 feet 6 inches tall and weighs 260 pounds. She remarried one year ago, and she and her new husband live in a house with her three children, ages 9, 12, and 16, and small dogs. Her husband drove her to the hearing; her license was revoked for failing to register her vehicle and driving without insurance. Her sole source of income is child support and her husband's disability check. She is on Medicaid. (TR. 35-38.)

She graduated from high school and earned a certificate in child care after attending two years of vocational technical school. Her certificate allows her to operate her own daycare although she is not sure if it is still valid. She began working as a CNA before her oldest daughter was born. As a CNA, she was required to wake, feed, bathe, and shave residents. She was required to lift the residents, sometimes with the assistance of another. She quit her CNA positions. (Tr. 35-43.)

She last worked in 2006 when she worked for two or three months as a cashier at a Fast Stop gas station. She has done temporary work assembling baskets and other things for Bath and Body Works during the 2004 and 2005 holiday seasons. Other than that, she has not been employed. Her job at the gas station ended because her "drawer didn't come out right" as she is not good at math. (Tr. 35-43.)

She has not sought work recently because her doctor, Dr. Parsonson, said she is not fit for work. She has also seen Kristy Willing for counseling on a weekly or monthly basis for the past two years. (Tr. 43-45.)

On a typical day, she gets up and takes her medicine. She gets her medications filled at Wal-Mart, and Medicaid helps pay for it. On a good day, she will clean and do crafts. She is currently making bouquets and table settings for an upcoming wedding. She attends a table at craft shows with her mother but has had little success with sales. She is able to take care of her children. She goes "junking" with her boyfriend twice a week or more by going into dumpsters and removing metal and aluminum for resale. She has been "junking" for sixteen or seventeen years. The amount of money they make varies, although they made two hundred dollars the previous week. She also likes to spend time with her family. She does not watch television. She cooks, makes the beds, does the laundry, grocery shops, and sometimes works in their flower and vegetable garden. (Tr. 45-49.)

She does not smoke or drink. She takes Lithium twice a day, as well as Zyprexa, Prozac, and Seroquel, and Ranitidine for acid reflux. Her medications help but are not 100% effective. Dr. Parsonson prescribes her medications. She does not have any side effects from her medications. (Tr. 49-52.)

She cannot work because she is scared she is going to be rude or hurt someone due to her mood swings. She does not think she is stable enough to work because her medication is not 100% effective. Even on medication, she gets in a mood where she does not care and remains in her room and does not talk to anyone. This occurs twice a week and lasts all day. Her condition improves by keeping to herself. Otherwise she gets angry, uses profanity, and gets violent. (Tr. 53-54.)

Even on her medications, plaintiff hears the voices of her deceased relatives talking to her. She sees them once or twice a week when she is in her room and they tell her to come and be with them. On bad days, plaintiff remains in her room, sleeps all day, and cries. She does not take care of her personal hygiene, and cannot do housework, cook, go "junking," or attend craft shows. On good days, she is happy-go-lucky, capable around the house, and able to take care of herself. (Tr. 55-58.)

She is not good with money because she cannot perform basic math or make correct change. She inherited approximately $40,000 from her grandfather and blew it in one month on "stupid stuff." She is able to drive. She was in special education while in school. On a good day she gets out of bed at 7:00 a.m. She goes to bed between 8:00 and 10:00 p.m. and is able to sleep through the night. (Tr. 57-59.)

Barbara Myers, vocational expert (VE), testified to the following at the hearing. Plaintiff's past relevant work (PRW) is categorized as (1) cashier, light and unskilled; (2) nurse aide, medium, semi-skilled; and (3) packager medium, unskilled. (Tr. 60.)

The ALJ presented the VE with a hypothetical individual who had the same vocational factors as plaintiff, with no exertional limitations, who was limited to simple, routine tasks. The individual had only occasional decision-making, occasional changes in the work setting, and occasional interaction with the public or coworkers. The VE testified that such an individual would be able to do the past work of packager, as well as laundry worker, cleaner, and kitchen helper. (Tr. 61.)

Under a second hypothetical, the VE testified that no jobs would be available if the claimant was unable to sustain full-time work eight hours a day on a regular and consistent basis , because more than two unexcused or unscheduled absences a month is unacceptable to an employer. (Tr. 62.)

### III. DECISION OF THE ALJ

On August 14, 2012, the ALJ issued a decision finding that plaintiff was not disabled. The ALJ found that plaintiff had the severe impairments of bipolar disorder, generalized anxiety disorder, and borderline personality disorder. (Tr. 13.) However, the ALJ found plaintiff did not have an impairment or combination of impairments listed in or medically equal to one contained in the listings, 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 14-15.) The ALJ determined that plaintiff had the RFC to perform a range of simple work with limited interaction with others. She could perform work at all exertional levels, but was limited to simple, routine tasks. She could occasionally make decisions and adapt

to changes in the work setting and could have occasional interaction with co-workers and the public. (Tr. 15.) The ALJ concluded that plaintiff's impairments would not preclude her from performing her past work as a packager. Accordingly, the ALJ found plaintiff not disabled under the Act. (Tr. 21-22.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If

the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform PRW. Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred in not according controlling weight to the opinion of her treating physician, Dr. Parsonson. She also argues the ALJ erred in ignoring the amended alleged onset date (AOD) of October 21, 2009 and relying on evidence that pre-dates the amended date. This court disagrees.

### 1. Residual Functional Capacity and Credibility

Because it bears indirectly on the issue of the ALJ's consideration of treating physician Dr. Parsonson's opinion, the court will first discuss the ALJ's RFC determination and her credibility finding. RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. §§ 404.1545, 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. An "RFC assessment must include a narrative

discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (1996).

In this case the ALJ determined that plaintiff retained the RFC to perform a range of simple work with limited interaction with others. She could perform work at all exertional levels, but was limited to simple, routine tasks. She could occasionally make decisions and adapt to changes in the work setting and could have occasional interaction with co-workers and the public. (Tr. 15.)

In finding plaintiff capable of a range of simple work with limited interaction with others, the ALJ considered the record as a whole, including plaintiff's subjective complaints. The ALJ properly found plaintiff's allegations inconsistent with the record as a whole, including her medical record evidence, daily activities, work history, and the medical opinions. The ALJ's consideration of the subjective aspects of plaintiff's complaints comported with the regulations at 20 C.F.R. §§ 404.1529, 416.929 (2013), and the framework set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

The record evidence supported the ALJ's determination that plaintiff was not fully credible. In evaluating plaintiff's credibility, the ALJ considered her medical treatment. The ALJ noted that plaintiff's medications helped her condition. (Tr. 16, 19, 53, 220-23, 254-58, 291, 454, 458, 477, 520.) See Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) (impairment cannot be considered disabling if it can be controlled by treatment or medication). However, plaintiff was frequently not compliant with her medications. (Tr. 293.) See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (failure to follow recommended course of treatment weighs against claimant's credibility). Plaintiff also did not comply with other medical recommendations; she avoided counseling and received no treatment between March 2010 and March 2011. (Tr. 19, 347, 453-56, 500, 504.) The ALJ also noted that plaintiff's treatment frequently revolved around situational stressors, specifically her family relationships, that are not a basis for disability. (Tr. 245, 250-51, 254-55, 290, 455.) Cf. Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010)

(medical record supports conclusion that any depression was situational in nature, related to marital issues, and improved with medication and counseling). Plaintiff's limited medical treatment does not support the extent of her allegations. (Tr. 16, 19.)

Furthermore, to the extent plaintiff is suggesting that her impairment prevented her from complying with prescribed treatment or seeking more regular treatment, this argument fails. While a mental impairment can prevent an individual from complying with treatment, there is no record evidence to support the assertion that plaintiff's noncompliance was caused by her mental impairment. Cf. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010) (there is little or no evidence expressly linking claimant's mental limitations to repeated noncompliance). Plaintiff also failed to identify record evidence demonstrating that her mental impairment precluded her from being compliant with her medication, returning phone calls, and seeking treatment. As such, the ALJ properly considered plaintiff's noncompliance and limited medical treatment. (Tr. 16, 19.)

Consistent with Polaski, the ALJ also found plaintiff's allegations of disabling symptoms not supported by the medical evidence. Plaintiff alleged disability, in part, based on bipolar disorder. However, the medical records demonstrate that plaintiff generally appeared alert and oriented with normal speech, intact memory, and a logical thought process. (Tr. 17-18, 220, 222, 224, 244-46, 248-52, 254, 257, 259, 301, 307, 319, 335, 357, 362, 380-81, 391, 405, 419, 436, 454). See Halverson v. Astrue, 600 F.3d 922, 933 (8th Cir. 2010) (inconsistent with a claimant's allegations of disability, the claimant appeared alert and oriented with normal speech and thought processes). Plaintiff's assertion that she had difficulty interacting with others was also inconsistent with the record evidence demonstrating that she generally remained very pleasant, cooperative, and calm. (Tr. 220, 222, 224, 244-46, 248-50, 252, 254-55, 335, 380, 391, 405, 419, 443, 477, 479, 482, 485.) Thus, the ALJ properly concluded that the medical evidence did not support plaintiff's alleged limitations. (Tr. 17-18.)

The ALJ also considered plaintiff's daily activities in assessing her credibility. Plaintiff retained the ability to maintain her personal care and care for her children and

pets. She could prepare meals, clean, wash dishes, do laundry, shop, and drive. She could ride ATVs, perform yard work, work on crafts, and decorate for parties. (Tr. 45-46, 48-49, 184-88, 206, 336-37, 374, 378, 453, 458, 506, 510-11, 517.) Cf. McCoy, 648 F.3d at 614, (cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain). Plaintiff's assertion that she had difficulty getting along with others was inconsistent with her ability to spend time with others, shop, and attend craft shows. She also performed part-time work--including after her AOD--by "junking" or collecting scrap metal and other items for resale. (Tr. 19-20, 334, 337, 453, 456, 458, 513, 520). The ALJ properly considered the inconsistencies between plaintiff's subjective allegations and the record as a whole in evaluating her credibility.

Finally, the ALJ properly considered plaintiff's work history. Plaintiff's highest earnings were $12,000 in 2000. She had no earnings in 1996, 2003, and 2005. (Tr. 155). Therefore, plaintiff's work history did not support her credibility. See Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (poor work history distracts from claimant's credibility).

This court concludes that the ALJ properly evaluated plaintiff's credibility and found her allegations of disability not credible. Substantial evidence supports the ALJ's finding that plaintiff could perform a range of simple work with limited interaction with others.

## 2. Opinion of Robert A. Parsonson, D.O.

The ALJ also properly considered the opinion of Dr. Parsonson. Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. See 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007). Likewise, an ALJ may appropriately rely on non-

examining opinions as part of his RFC analysis. See Hacker v. Barnhart, 459 F.3d 934, 935, 939 (8th Cir. 2006) (ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors). Ultimately, it is up to the ALJ to determine the weight each medical opinion is due. Id., 459 F.3d at 936 (ALJ's task is to resolve conflicts in the evidence). In this case, the ALJ properly considered Dr. Parsonson's statements and found them entitled to little weight.

As to Dr. Parsonson's opinion that plaintiff was permanently disabled, the ALJ properly found his opinion was entitled to little weight because a determination of disability is an issue reserved for the Commissioner. (Tr. 19, 471.) See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (treating physician's opinion that claimant is disabled or cannot be gainfully employed gets no deference because it invades province of the Commissioner to make ultimate disability determination); 20 C.F.R. §§ 404.1527(d), 416.927(d) (2013). The ALJ also properly noted that Dr. Parsonson's statement provided no basis for his opinion and was inconsistent with his earlier statement that plaintiff appeared capable of working. (Tr. 19-20, 456, 471.)

The ALJ also properly considered the Mental MSS submitted by Dr. Parsonson. (Tr. 19, 487-89.) Dr. Parsonson opined that plaintiff could satisfactorily understand and remember simple instructions, make judgments on simple work-related decisions, understand and remember complex instructions, carry out complex instructions, and interact appropriately with supervisors. However, he opined that plaintiff had a substantial loss in her ability to function in carrying out simple instructions, making judgments on complex work-related decisions, interact appropriately with the public and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 487-88.) The ALJ properly found that Dr. Parsonson's opinion was not based on objective evidence, but, rather on plaintiff's subjective report. As discussed above, the ALJ found plaintiff's "subjective reports" not credible, and therefore did not err in giving Dr. Parsonson's opinion less weight. (Tr. 19). Cf. McCoy, 648 F.3d at 617 (doctor's evaluation appeared to be based, at least in part, on claimant's self-reported

symptoms and, thus, insofar as those reported symptoms were found to be less than credible, doctor's report was rendered less credible).

Moreover, to the extent plaintiff is arguing that there is no objective evidence to evaluate mental impairments, this court disagrees. The regulations provide that objective evidence for mental impairments includes psychological abnormalities which can be observed, apart from a claimant's statements. See 20 C.F.R. §§ 404.1528, 416.928 (2013). Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. See 20 C.F.R. §§ 404.1528, 416.928. As discussed above, the medical record evidence shows that plaintiff frequently appeared alert and oriented with normal speech, intact memory, and a logical thought process. (Tr. 17-18, 220, 222, 224, 244-46, 248-52, 254, 257, 259, 301, 307, 319, 335, 357, 362, 380-81, 391, 405, 419, 436, 454).

Further, Dr. Parsonson's opinion is internally inconsistent. He opined that plaintiff could satisfactorily carry out complex instructions, but could not carry out simple instructions. (Tr. 487.) There is no reasonable explanation for the inconsistency. Cf. Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006) (given the inconsistencies between doctor's letter and his MSS, as well as lack of supporting objective evidence, the ALJ did not err in discounting doctor's opinion). This court concludes that that based on the record as a whole, the ALJ properly considered Dr. Parsonson's opinion and found it entitled to little weight.

Plaintiff also suggests that she had greater limitations based on the GAF scores of 50, citing Pate-Fires v. Astrue in support of her contention that her GAF scores demonstrate that she is disabled. According to the Diagnostic and Statistical Manual of Mental Disorders (DSM), the GAF scale is intended for use by practitioners in making treatment decisions. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed.-Text Revision 2000) (DSM-IV). However, the most recent version of the DSM dropped GAF from inclusion because of its "conceptual lack of

clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." DSM-V 16 (5th ed. 2013).

Moreover, neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." See 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (August 21, 2000).

While the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning. See Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (GAF score may be of considerable help in formulating RFC, but is not essential to RFC's accuracy). GAF scores may also be considered by the ALJ when considering weight to be given treating doctor's opinion and whether the doctor's opinion is inconsistent with treatment record. Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013).

In Pate-Fires, the Eighth Circuit held that because the claimant's GAF score was above 50 only four out of twenty-one times in a six-year period, the history of GAF scores at 50 and below, taken as a whole, indicated serious symptoms and supported the treating physician's opinion that the claimant was not capable of gainful employment. 564 F.3d at 944. In this case plaintiff has not presented a history of GAF scores similar to Pate-Fires. The ALJ in this case relied heavily on plaintiff's actual daily activities and other record evidence in reaching her conclusions. Finally, the Eighth Circuit has since noted that the court in Pate–Fires did not reference 65 Federal Regulation 50746, 50764–65 (August 21, 2000), in which the Commissioner declined to endorse the GAF scales to evaluate Social Security claims because the scales do not have a direct correlation to the severity requirements in mental disorders listings. Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010). Therefore, because there is no direct correlation between plaintiff's GAF scores

and a mental impairments' severity, and the ALJ has no obligation to credit or even consider GAF scores in the disability determination, plaintiff's reliance on her GAF scores is without merit.

The ALJ also properly weighed the state agency medical consultant's opinion. (Tr. 20, 266-79.) In May 2010, Mark Altomari, Ph.D., reviewed plaintiff's medical records and opined that plaintiff had moderate limitations in social functioning. (Tr. 266-79.) Based on these limitations, plaintiff retained the ability to perform short and simple instructions, relate appropriately to co-workers and supervisors in small numbers and for brief periods, adapt to most usual changes common to competitive work, and make simple work-related decisions. (Tr. 279.) The ALJ appropriately accommodated the limitations in the RFC finding. (Tr. 15, 20.) See Kamann v. Colvin, 721 F.3d 945, 951 (8th Cir. 2013) (ALJ reviewed the medical record evidence and issued a finding consistent with the reviewing agency psychologist).

### 3. Amended Alleged Onset Date

Plaintiff next argues that the ALJ improperly considered evidence prior to October 21, 2009, suggesting that an ALJ cannot consider evidence prior to an AOD. However, the ALJ may consider evidence prior to an AOD in order to evaluate whether the limitations lasted for 12 continuous months, and plaintiff has not provided authority holding otherwise. The ALJ must also consider how plaintiff's impairments have changed over time. See e.g., Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) (ALJ found claimant's speech impediment was not as limiting as alleged because claimant effectively worked as a nurse's aide with her speech impediment and there is no indication that her ability to speak had deteriorated since her stroke in 1997). Also, plaintiff received minimal medical treatment after October 21, 2009 and received no treatment between March 2010 and March 2011. As such, it was necessary for the ALJ to rely on earlier medical records to evaluate plaintiff's claims.

Finally, the ALJ did not err in not amending plaintiff's AOD. Counsel stated at the administrative hearing that plaintiff's June 1, 2007 AOD was not supported by the record and that the appropriate AOD was October 21, 2009. (Tr. 32.) The ALJ requested--and counsel agreed--to submit the proposed amended AOD in writing. (Tr. 32-33.) Counsel did not do so. Instead, plaintiff submitted additional evidence restating that the June 1, 2007 AOD. (Tr. 488). Based on all of these facts, the ALJ properly evaluated plaintiff's impairments since June 1, 2007. (Tr. 11.)

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.



                                                    S/ David D. Noce
                                        **UNITED STATES MAGISTRATE JUDGE**

Signed on September 9, 2014.